# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | Geraldine Soat Brown |
|---|---|---|---|
| **CASE NUMBER** | 99 C 805 | **DATE** | 9/18/2000 |
| **CASE TITLE** | | Pouska vs. Apfel | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Report and Recommendation recommending that Plaintiff's Motion for Summary Judgment should be **GRANTED**, the Commissioner's Motion for Summary Judgment should be **DENIED**, and this case be remanded to the Secretary pursuant to the Court's authority under 42 U.S.C. S 405(g) for the sole purpose of determining the period of disability and the payment of benefits, is submitted herewith. Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed. R. Civ. P. 72(a). Failure to file objections with the District Court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the report and recommendation. Lorentzen v. Anderson Pest Control, 64 F.3d 327, 330 (7th Cir. 1995). All matters relating to the referral of this case having been concluded, the referral is closed and the case is returned to the assigned Judge. Geraldine Soat Brown

(11) ■ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | date docketed |
| ✓ | Docketing to mail notices. | |
| | Mail AO 450 form. | docketing deputy initials |
| | Copy to judge/magistrate judge. | |

**SEP 19 2000**

ED-7
FILED FOR DOCKETING

00 SEP 18 PM 4: 11

**SEP 19 2000**
date mailed notice

Document Number

17

| TW | courtroom deputy's initials | | Date/time received in central Clerk's Office | mailing deputy initials |
|---|---|---|---|---|

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JOHN J. POUSKA,  )
        **Plaintiff,**  )
  )
  **v.**  )  **Case No. 99 C 805**
  )
KENNETH S. APFEL, **Commissioner**  )  **Judge Joan B. Gottschall**
of Social Security,  )  **Magistrate Judge Geraldine Soat Brown**
        **Defendant.**  )
  )
  )
  )

DOCKETED
SEP 19 2000

To:    The Honorable Joan B. Gottschall
       United States District Court Judge

## Report and Recommendation

Geraldine Soat Brown, United States Magistrate Judge

     Plaintiff John J. Pouska ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Title II disability insurance benefits ("DIB") pursuant to the Social Security Act, 42 U.S.C. §405(g). Plaintiff seeks summary judgment reversing the Commissioner's decision and remanding his case for an award and calculation of benefits, or in the alternative, for an order remanding the case to the Commissioner for further proceedings. The Commissioner has filed a cross-motion for summary judgment in his favor. For the reasons set forth below, this Court respectfully recommends that Plaintiff's motion for summary judgment [DKT #9] be GRANTED and the Commissioner's motion for summary judgment [DKT #12] be DENIED.



## PROCEDURAL HISTORY

Plaintiff filed an application for Title II disability insurance benefits ("DIB") on July 30, 1995, alleging disability since December 29, 1994. (R. 94-96.)[1] His application was denied on November 28, 1995. (R. 99.) He filed a timely request for reconsideration (R. 103) which was denied on January 10, 1996. (R. 106.) He next filed a request for an administrative hearing.(R. 109.)[2] A hearing was held on February 15, 1997. (R. 32-93.) The Administrative Law Judge ("ALJ") rendered her decision denying Plaintiff's DIB on March 14, 1997. (R. 23-30.) Plaintiff again filed a timely request for review. (R. 18-19.) On December 5, 1998 the Appeals Council denied Plaintiff's request. (R. 5-6.) Plaintiff subsequently filed a Complaint for judicial review pursuant to 42 U.S.C. § 405(g). [DKT #1]

## BACKGROUND

Plaintiff was born on April 12, 1946. (R. 37.) He is a high school graduate and indicated he also has two years of college/technical school training. (R. 39-40.) He actively worked throughout most of his life until late 1994. Prior to December 1994, he worked as a "field engineer" which involves surveying at construction sites and requires being on one's feet all day, climbing, lifting, walking, bending. (R. 40-42.)[3]

---

[1] References ("R.") are to the certified administrative record prepared by the Commissioner and filed with this Court pursuant to 42 U.S.C.§405(g).

[2] Due to the length of time taken by the Social Security Administration in processing his case, Plaintiff wrote to his Congressman requesting help. (R. 299.) A letter, dated January 8, 1997, requesting an expedited review was sent to the Social Security office from Congressman Henry Hyde. (R. 298.)

[3] Plaintiff is a member of the Technical Engineers Local Union 130 and is currently receiving disability benefits from the union pension fund. (R. 358.) This information was submitted to the Appeals Council, which refused to consider it because it had not been submitted to the ALJ. (R. 5-7.)

In 1987 Plaintiff had total left hip replacement surgery. (R. 49, 279.) In 1993, his doctor advised him to find a different job to avoid the long term effect of stress on his hip. (R. 279.) However, Plaintiff continued working as a field engineer until he was laid off in late 1994. (R. 41.)[4]

On January 17, 1995, Plaintiff was hospitalized for cardiomyopathy, hypertension, ascites and a left ventricular clot.[5] (R. 138.) An echocardiogram indicated severe biventricular failure and left ventricle clot (R. 155) and showed: Left ventricle mildly dilated with severe global hypokinesis;[6] marked global hypokinesis with akinesis of antero-septal and inferior walls; left atrial enlargement, and both right atrium and ventricle mildly to moderately dilated. (R. 168.) A chest X-ray showed cardiomegaly. (R. 140, 213.) A Thallium test indicated showed severe coronary artery disease, cardiomyopathy (R. 167), and a treadmill test also indicated cardiomyopathy. (R. 143, 172.) Plaintiff was diagnosed with congestive heart failure. He was placed on Vasotec, Lasix, Digoxin, K-dur and Coumadin prior to his release. (R. 147.)

On June 23, 1995, Plaintiff collapsed without warning while at home. He went into cardiac arrest and was rushed to Resurrection Hospital. (R. 207-08.) The ER report noted cardiac arrest and acute myocardial infarction.[7] He had to be revived a number of times. (R. 59-60, 207.) A number

---

[4]Plaintiff testified that he looked for work after a construction job finished in September 1994, but was not hired. (R. 44.)

[5] Cardiomyopathy is a term used to describe a general disease of the heart muscle which causes the heart to become enlarged. It is usually manifested by signs of overall cardiac failure with congestive findings, as well as by fatigue. CECIL, Textbook of Medicine ("Cecil") at 336-38 (Lee Goldman, M.D. & J. Claude Bennett, M.D., eds., 21st ed. 2000). It is a degenerative disease. *Id.*

[6] Hypokinesis refers to diminished or slow movement. STEDMAN'S Medical Dictionary ("STEDMAN'S") (27th ed. 2000) at 861. Severe global hyperkinesis indicates that the entire heart muscle is not contracting properly. *See* Cecil, Cardiovascular Diseases.

[7] Cardiac arrest is the complete cessation cardiac activity. STEDMAN'S at 127. Myocardial infarction is commonly referred to as a heart attack. Cecil, *supra.*

of tests were conducted including an angiography, CT scan, ECG, and x-rays. A Post Thallium scan showed a large and fixed perfusion defect along inferior/posterior segment of the left ventricle.[8] A treadmill test, administered on July 3, 1995, indicated a ventricular arrhythmia and S/P myocardial infarction. (R. 181.) A head X-ray showed small areas of cerebral infarcts on both parietal lobes.[9] (R. 227.) Plaintiff's chart noted he suffered several in-hospital polymorphic ventricular tachycardia[10] arrests which occurred despite adequate beta-blockade. (R. 272.) As a result, on July 5, 1995, Plaintiff underwent surgery and had a cardiac defibrillator inserted.[11] He was released from the hospital on July 14, 1995. (R. 274.) In July 1995, he filed for social security disability insurance benefits alleging a disability onset of December 29, 1994. (R. 8.)

Plaintiff lives alone in a trailer owned by his brother. (R. 37.) Plaintiff testified that he often gets dizzy or lightheaded (R. 45), has pain in his sternum two or three times per day (R. 46-47, 62-63, 64), has frequent hip pain (R 45, 49), gets tired easily (R. 45, 52) and has memory problems. (R. 59.) He states that he can drive a car, but not very much (R. 39), he does minimal housework once or twice a month and at his own pace (R. 55), he can stand for about 15-30 minutes and can sit for about the same (R. 51-52), he goes to church every Sunday (R. 57), and his only real exercise is

---

[8] A "fixed" perfusion is not reversible (correctable). It is a persistent defect. *See* Cecil at 198.

[9] A cerebral infarct is an area of cerebral brain tissue death that has resulted from a sudden insufficiency of blood supply. STEDMAN"S at 894.

[10] Tachycardia is a condition involving excessive rapidity in the action of the heart. STEDMAN'S at 1782. It can be a dangerous arrhythmia that can precipitate the patient's sudden death. Cecil, *supra.*

[11] In Plaintiff's Memorandum in Support of Summary Judgment the purpose of his surgery is described as insertion of a pacemaker. A pacemaker and a defibrillator are two different mechanisms. A defibrillator is a designed to activate only during tachycardic episodes and to shock the heart back into its normal rhythm. This device does not prevent the onset of tachycardia. Dorland's Medical Dictionary ("Dorlands"), (28th ed.1994) at 269. A pacemaker provides an ongoing pacing of the heart and maintains a constant heart rhythm. STEDMAN'S at 1295.

4

walking slowly outside and sometimes riding his bike very slowly for short periods of time in the summer. (R. 54, 57.)

## STANDARD OF REVIEW

The Social Security Act ("the Act") provides for limited judicial review of a final decision of the Commissioner (effectively that of the ALJ where the Appeals Council has denied the applicant's request for review).[12] Where the Commissioner commits an error of law, "reversal is required without regard to the volume of the evidence in support of the factual findings." *Imani v. Heckler*, 797 F.2d 508, 510 (7th Cir. 1986). With respect to the Commissioner's conclusions of fact, the reviewing court's role is limited. There the role of the district court is only to determine whether the decision of the ALJ is supported by substantial evidence in the record. 42 U.S.C. §§ 405(g),[13] 1383(c)(3); *Wolfe v. Shalala*, 997 F.2d 321, 322 (7th Cir. 1993) (citations omitted). In reviewing the [Commissioner's] decision, the court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the [Commissioner]. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *Brown v. Chater*, 913 F. Supp. 1210 (N.D. Ill. 1996). Thus, this court does "not substitute [its] own judgment for that of the ALJ." *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997).

---

[12] Under the Social Security Act, a plaintiff must be disabled in order to be eligible for benefits. Disability means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a disability "only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ... in significant numbers either in the region where such individual lives or in several regions in the country." *Id.* § 423(d)(2)(A).

[13] Section 405(g) of the Act provides that a district court "shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The statute further provides that "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive...." *Id.*

Rather, the court must affirm a decision supported by substantial evidence in the absence of an error of law. *Herr v. Sullivan*, 912 F.2d 178, 180 (7th Cir. 1990) (citations omitted); *Edwards v. Sullivan*, 985 F.2d 334, 336-37 (7th Cir. 1993). Substantial evidence means " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420 (1971)).

## THE COMMISSIONER'S ROLE

When evaluating a disability claim the Commissioner (or ALJ) must consider all relevant evidence and may not select and discuss only that evidence that favors his ultimate conclusion. *Herron*, 19 F.3d 329, 333. Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the [Commissioner], not the courts. *Herr*, 912 F.2d 178, 181; *see also, Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which he finds more credible). Where there is a conflict between medical opinions, the [Commissioner] may choose between those opinions but may not substitute his own lay opinion for that of the medical professionals. *Davis v. Chater*, 952 F. Supp. 561, 566 (N.D. Ill. 1996). A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. 20 C.F.R. sec 404.1527(d)(2); *Clifford v. Apfel*, -- F.3d --, 2000 WL 1297717 at *5 (7th Cir., Sept. 14, 2000). The district court is limited to determining whether the [Commissioner's] final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Secretary of Health and Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992). This does not mean that

the [Commissioner] is entitled to unlimited judicial deference, however. In addition to relying on substantial evidence, the [Commissioner] must articulate his analysis at some minimal level and state his reasons for accepting or rejecting "entire lines of evidence," although he need not evaluate in writing every piece of evidence in the record. *See Herron*, 19 F.3d at 333; *see also, Young v. Secretary of Health and Human Servs.*, 957 F.2d 386, 393 (7th Cir. 1992) (ALJ must articulate his reason for rejecting evidence "within reasonable limits" in order for meaningful appellate review); *Guercio v. Shalala*, No. 93 C 323, 1994 WL 66102, *9 (N.D. Ill. Mar. 3, 1994) (ALJ need not spell out every step in his reasoning, provided he has given sufficient direction that the full course of his decision may be discerned) (citing *Brown v. Bowen*, 847 F.2d 342, 346 (7th Cir. 1988)).

## THE EVALUATION PROCESS

The Social Security regulations prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. § 416.920 (1994). The ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *Id.; see also, Young*, 957 F.2d 386, 389. If the claimant satisfies step three or five, the claimant automatically will be found disabled. *Garfield v. Schweiker*, 732 F.2d 605, 607 n. 2 (7th Cir. 1984). If the claimant cannot satisfy step three, then he must satisfy step four. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). Additionally, the claimant has the burden of production and persuasion at steps one through four.

*Id.* Once the claimant shows an inability to perform past work, step four, the burden shifts to Commissioner to show the claimant is able to engage in some other types of gainful employment. *Id.* The Commissioner can meet that burden by showing that the claimant is capable of performing some other work that exists in significant numbers in the national economy, taking into consideration the claimant's age, education, and work experience. *Lee v. Sullivan*, 988 F.2d 789, 792 (7th Cir. 1993). By "other work," SSA means "jobs existing in significant numbers in the national economy." 20 C.F.R. § 404.1560.

### DISCUSSION

The ALJ found that Plaintiff had satisfied the first two elements under 20 C.F.R. § 416.920. (R. 24.) At step three, the ALJ concluded that Plaintiff's impairments "do not meet or equal in severity a listed impairment." (Id.) At step four the ALJ determined that Plaintiff could not return to his past relevant work. (R. 28.) She then found that he had the residual functional capacity ("RFC")[14] to "lift and carry a maximum of 15 pounds, to stand for up to 2 hours at a time, to walk several blocks at a time, and to sit indefinitely." (R. 24-25.) The ALJ presented this RFC to the vocational expert and added limitations that Plaintiff could not work in an environment with electrical machines or magnets and that he should avoid work that requires working at a faster than normal pace, emergency deadlines, or high levels of interpersonal conflict. Based on these facts, the vocational expert at the hearing testified that there were 1,300 semiskilled inspection jobs and 9,000 semiskilled cashier jobs that someone with Plaintiff's profile could perform. (R. 83-84, 27-8.)

---

[14] A claimant's residual functional capacity is "what [he] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a).

Plaintiff contends that the ALJ's decision is not supported by substantial evidence and that the ALJ made errors of law. (Pl.'s Mem. at 8.) At step three, the ALJ determined that Plaintiff had significant congestive heart failure that is now controlled, and therefore is no longer disabled. (R. 24.) Plaintiff argues that, in so finding, the ALJ committed an error of law in failing to find that Plaintiff has a listed impairment; that the ALJ's finding is not supported by substantial evidence; and that to arrive at her conclusion the ALJ ignored evidence, discounted evidence and incorrectly interpreted evidence. (See Pl.'s Mem. in Supp.) Secondly, even if he does not meet a listed impairment at step three, Plaintiff contends that the combination of his disabilities is severe enough to preclude him from a significant number of jobs and that the finding of the ALJ that he is not disabled is not supported by substantial evidence. (Id.)

## DOES PLAINTIFF'S IMPAIRMENT MEET OR EQUAL IN SEVERITY A LISTED IMPAIRMENT?

The burden is on the ALJ in a Social Security disability proceeding to identify the relevant listed impairments in the federal regulations that compare with the claimant's impairment. Social Security Act, § 223(d)(2)(A), as amended, 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520. On February 10, 1994, a revised set of regulations took effect, changing the listing for "congestive heart failure" to "chronic heart failure," defining cardiac enlargement, and providing that the listing may be met by a claimant who shows a marked intolerance for exercise related to symptoms of chronic heart failure. *See* 59 Fed. Reg. 6472 (1994) (codified at 20 C.F.R. Pt. 404, Subpt. P, App. 1., § 4.02(B) (1994)). Recognizing that fluid retention can be controlled with medication, the new regulations also removed the requirement that peripheral or pulmonary edema be present on physical

or laboratory examination. *Id.*[15] Under 20 C.F.R. Pt. 404, Subpt. P, App.1 §4.02(A), chronic heart failure while on a regimen of prescribed treatment is a listed impairment evidenced by:

> documented cardiac enlargement by appropriate imaging techniques . . . resulting in inability to carry on any physical activity, and with symptoms of inadequate cardiac output, pulmonary congestion, systemic congestion, or anginal syndrome at rest (e.g. persistent fatigue, dyspnea, orthopnea, anginal discomfort).
> OR
> B.    Documented cardiac enlargement by appropriate imaging techniques or ventricular dysfunction manifested by S3, abnormal wall motion or left ventricular ejection fraction of 30 percent or less by appropriate imaging techniques; and . . .

In her step three analysis the ALJ stated that Plaintiff had "significant congestive heart failure in 1995," but that it was "now controlled" and thus she found that Plaintiff did not qualify at step three. (R. 24.) It appears that the ALJ based her decision primarily on the fact that Plaintiff's ejection fraction was last tested at 35-40% and the listing level in an alternative section, §4.02(B), is 30% or below.[16] The medical expert, Dr. Abramson, testified that the normal rate is 54% to 80% and that Plaintiff's rate was "much below normal."[17] (R. 81, 75.) Furthermore, ejection fraction is not the sole measure of chronic heart failure, and a rejection rate of 30% is not a requirement of §4.02(A). There is no indication that the ALJ considered any of the additional symptoms enumerated in § 4.02(A). In this case, the record also shows that when Plaintiff applied for DIB he

---

[15]   Prior to 1994 Appendix 1 listed as an impairment: "congestive heart failure (manifested by evidence of vascular congestion such as hepatomegaly, peripheral or pulmonary edema) with persistent left ventricular enlargement and hypertrophy documented by both: extension of the cardiac shadow . . . and ECG showing . . . ." 20 C.F.R. Pt. 220, App. 1 §§ 4.01, 4.02.  *See Price v. Shalala,* NO. 93 C 5406, 1994 WL 521062 (N.D. Ill. Sep 22, 1994).

[16]   "Ejection fraction" is a measure of the efficiency of the ventricles. It is "the proportion of the volume of blood in the ventricles at the end of diastole that is ejected during systole[.]" Dorland's at 660.

[17]   Dr. Abramson graduated from Long Island College of Medicine in 1929 and his curriculum vita indicates he has not actively practiced medicine since 1972. He was board certified in internal medicine in 1946. (R. 354.)

suffered from cardiomyopathy[18] and coronary artery disease. (R. at 167, 281.) He also had

hypertension (R. 274, 350, 357), severe hypokinesis (Id. at 168, 350), peripheral edema (Id. at 343)[19],

and tachycardia. (Id. at 281.) His testimony indicates that he still experiences anginal syndrome (Id.

at 47, 48, 63, 64), persistent fatigue (Id. at 45, 52), dizziness/lightheadedness (Id. at 45, 51, 52, 59),

and dyspnea (Id. at 65, 66).[20]

The ALJ's step three analysis fails to discuss the report submitted by Plaintiff's cardiologist,

Carl Eyebel (R. 336-39) which supports the conclusion that Plaintiff's chronic heart failure

evidences the symptoms described in §4.02(A). To the question, "Does your patient have marked

limitation of physical activity as demonstrated by fatigue, palpitation, dyspnea or anginal discomfort

on ordinary physical activity, even though your patient is comfortable at rest?" Dr. Eyebel answered

"yes." (R. 336.) Dr. Eyebel listed Plaintiff's symptoms as "fatigue" and "shortness of breath." (Id.)

He listed Plaintiff's prognosis as "fair." (Id.)

The other factor cited by the ALJ in her step three analysis was a stress test done on July 3,

1995, which the ALJ erroneously stated had been given in November, 1995.[21] That stress test was

administered prior to Plaintiff's defibrillator implantation and is not an indication of Plaintiff's

condition after the defibrillator implant. Nor does it preclude a finding of chronic heart failure as

---

[18]Cardiomyopathy is a listed impairment at §4.08, and the regulations instruct the Commissioner to evaluate the claims on the basis of §4.04 and §4.02.

[19] Edema is an accumulation of excessive amounts of watery fluid in the cells or intercellular tissue spaces of the body. STEDMAN'S at 566-67.

[20] Dyspnea is a shortness of breath that is usually associated with disease of the heart or lungs. STEDMAN'S at 556.

[21] The Bruce protocol stress test in which Plaintiff reached a 10 METS (a negative result) was interpreted by a reviewing doctor on November 2, 1995, but the actual test was administered on July 3, 1995. (R. 283.)

described in §4.02(A). At best, the July 1995 test indicates some slight improvement (from the January 1995 test) but the test results also state that Plaintiff suffered from ventricular arrhythmia and S/P myocardial infarction. (R. 181.)

It appears that, in coming to the conclusion that Plaintiff did not have a listed impairment, ALJ adopted Dr. Abramson's testimony that Plaintiff had "controlled congestive heart failure" (R. 74) but disregarded both Dr. Eyebel's report and the portions of Dr. Abramson's testimony that would support a finding of disability under the standards set out in the revised listing for chronic heart failure. (R. 75.)[22] Dr. Abramson testified that Plaintiff had suffered a complete occlusion of one artery and that even after the second echocardiogram there was severe involvement of portions of the left ventricle (R. 73), and some involvement of the right coronary artery. (R. 74.) He stated that he was concerned about Plaintiff's edema, and that part of the basis for Plaintiff's tiredness was his poor heart function. (R. 80.) Dr. Abramson testified that Plaintiff also has a distended jugular indicating that blood is backing up into the right atrium because the heart is not functioning normally. (R. 80-81.) He testified that the medical records showed that Plaintiff has and "definite cardiomyopathy there. Better than it was but still there." (R. 78.) Dr. Abramson concluded that

> there has been no significant improvement as far as the heart was concerned. In other words, the heart is better than it was before but it still has the areas of hypokinesia. . . [T]here is still some difficulty as far as congestive heart failure is concerned. I'd say he's on the threshold but he's not in congestive heart failure now.

(R. at 79-80.)

---

[22]Dr. Abramson testified that he was familiar with the Commissioner's medical listings. (R. 74.) However, Dr. Abramson's failure to refer to the condition listed in the 1994 revision ("chronic heart failure) and his reference to the terminology used in the out-dated listing ("congestive heart failure") suggests that in reaching his conclusion Dr. Abramson may have been using the prior criteria and not the current criteria. The 1994 revision is applicable to Plaintiff, and there is no issue of retroactive application as there was in *Prince v. Shalala, supra.*

The nature of the medical expert's conclusion – that Plaintiff is "on the threshold" of an impairment – cannot justify the ALJ's failure to consider the report by Dr. Eyebel and the other medical reports confirming the existence of symptoms set out in §4.02(A). Likewise, as noted above, the two tests cited by the ALJ do not rule out a finding of impairment if the symptoms listed in §4.02(A) are evidenced, which they are. Furthermore, the ALJ failed to consider in any way what affect Plaintiff's hip condition and the limitations imposed by that condition might have on his heart. [23] In this Judge's opinion, the AJL erred in failing to consider all of the relevant evidence in reaching her conclusion that Plaintiff's impairment does not meet or equal the listed impairment of chronic heart failure under the criteria set out in §4.02(A), and that conclusion is not supported by substantial evidence.

## CAN PLAINTIFF PERFORM SUBSTANTIAL GAINFUL WORK?

Assuming *arguendo*, that Plaintiff's heart condition does not meet or equal any impairment listed in the regulations, the ALJ's determination that Plaintiff's RFC enables him to perform other substantial gainful employment that exists in significant number in the economy is not supported by substantial evidence. Because the ALJ determined at step four that Plaintiff could not return to his past relevant work, the burden shifted to the Commissioner to prove that Plaintiff can perform gainful work that exists in substantial numbers. (R. 27.) At her step five analysis, the ALJ improperly discounted the reports by Plaintiff's treating physicians and Plaintiff's testimony about his pain and fatigue, and selected certain evidence in isolation without also considering the evidence

---

[23] Dr. Abramson stated that stress can cause the body to produce substances that increase the work of the heart. (R. 75.)

that was favorable to Plaintiff's claim. The ALJ's errors here are similar to those committed by the ALJ in *Clifford v. Apfel*, 2000 WL 1297717 (Sept. 14, 2000), which caused the Seventh Circuit in that case to reverse the Commissioner's decision to deny benefits. Additionally, here, the ALJ's formulation of Plaintiff's residual functional capacity ("RFC"), and therefore the hypothetical question that she posed to the vocational expert, were not based on the evidence in the record.

While the court may not substitute its own judgment, reweigh the evidence or reconsider credibility determinations made by the ALJ unless those credibility determinations are patently incorrect, *Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir. 1993); *Kapusta v. Sullivan*, 900 F.2d 94, 96 (7th Cir. 1989), the "substantial evidence" standard does not mean that courts should defer to an agency's determination by viewing the supporting evidence in isolation where the agency has ignored the contrary evidence. *Zblewski v. Schweiker*, 732 F.2d 75, 78-79 (7th Cir. 1984) (citing *Universal Camera Corp. v. National Labor Relations Bd.*, 340 U.S. 474, 488 (1951)).

At step five the ALJ must determine Plaintiff's residual function capacity (RFC). RFC is to be measured by a common sense approach viewing the claimant's condition as a whole. *Crosby v. Apfel*, 76 F. Supp. 2d 928 (N.D. Ill. 1999). The record as a whole contains the following evidence in addition to Plaintiff's medically documented heart condition.[24]

1. Subjective complaints of pain.

Plaintiff testified that he experiences pain in his sternum two or three times a day. (R. 47-8.) He also testified that prior to and since his hip replacement surgery in 1987 he has had pain in his

---

[24] The ALJ's opinion does not expressly refer to a RFC evaluation form partially completed by a Dr. Young Ja Kim. (R. 284-291.) The report is totally inadequate and incomplete, and does not reflect an understanding of Plaintiff's medical conditions. For example, the report notes no environmental limitations, when, as the ALJ noted, Plaintiff's defibrillator prevents him from being around machinery or magnets.

hip, ranging from a dull ache to a sharp pain. (R. 49.) He testified:

> The most I stand up for is probably 15 minutes to a half hour. . . . Then the pain gets
> to me. I mean even if I sit down, like I said I'm a squirmer. If I sit down too long
> or stay in one position too long then I get the pain on the hip. And the same thing
> with standing. If I stand too long or stand on all weight, if I take too long of a stride
> or if I slip. . . .
> I could probably sit in one place 15 minutes to a half hour but I have to keep
> adjusting my position.

(R. 51-52).

The ALJ discounted Plaintiff's testimony about his pain as "not fully credible." (R. 28). She

noted that after his hip replacement he had returned to his work as a field engineer and had engaged

in activities like deer hunting (referring to Exhibit 13, (R. 133) a record from his January 1995

admission to the emergency room.) (R. 27.) The ALJ also stated that Plaintiff is able to drive, (he

drove to the hearing), washes his own laundry, goes to church weekly, and rides his bicycle. (R. 27.)

This led the ALJ to conclude that, contrary to Plaintiff's testimony, he was able to stand for up to

two hours at a time, walk several blocks at a time, and sit indefinitely. (R. 28.) However, the ALJ

did not discuss the evidence about the limited nature of Plaintiff's current activities. Plaintiff

testified that he does things very slowly, only does small amounts at a time, has to rest frequently

and often has to lie down. The laundry room where he does his laundry is inside the trailer in which

he lives, next to the bathroom. (Id. at 39, 45, 49, 52, 55, 56, 57.) Additionally, the ability to perform

light housekeeping and drive a car is not alone substantial evidence of functional capacity.

*Halvorsen v. Heckler*, 743 F.2d 1221, 1226-27 (7th Cir. 1984).

The approach of the ALJ here is similar to that of the ALJ in *Clifford*, which the Seventh

Circuit held was error.

In this case, the ALJ does not explain why the objective medical evidence does not

15

support Clifford's complaints of disabling pain. Rather, the ALJ merely lists Clifford's daily activities as substantial evidence that she does not suffer disabling pain. This is insufficient because minimal daily activities, such as those in issue, do not establish that a person is capable of engaging in substantial physical activity.

*Clifford,* 2000WL 1297717, at *7.

The Act requires medical evidence of a condition that could reasonably produce pain, not objective evidence of the pain itself or its degree. *Boyle v. Chater,* NO. 95 C 1597, 1996 WL 153885 at *2 (N.D. Ill. Apr 01, 1996); *Maxwell v. Sullivan,* 792 F. Supp. 582, 38 (N.D. Ill. 1992). In Plaintiff's case, the medical records contain evidence of conditions that could reasonably produce pain, i.e. heart disease and total hip replacement. Moreover, Dr. Ghandi, the physician who treated Plaintiff for his hip condition from 1986 to 1993, documented Plaintiff's hip pain in a medical questionnaire. (R. 279-80.) He identified Plaintiff's diagnosis as spondylosis, degenerative disease and arthritis of the hip and thigh. (Id.)[25] Dr. Ghandi reported that the surgical result of the hip replacement was satisfactory but "the patient was having pain and discomfort." (R. 279.) He noted that Plaintiff walked with a cane. (Id.) Dr. Ghandi stated that when he last saw Plaintiff in 1993 he advised Plaintiff to retire from his construction work because of the long term effect in the hip area. (Id.)

The fact that Plaintiff returned to work after his hip replacement is not a sufficient basis for finding that his testimony about pain is not credible. Plaintiff argues that he remained at his job because the wages were good and he had a wife and children to support. (Pl.'s Reply at 3.) The fact that he returned to work after significant surgery demonstrates an inclination toward employment that supports his credibility in saying that he is now unable to work. *See Allen v. Califano,* 613 F.2d

---

[25] Spondylosis is a degenerative stiffening or fixation of the vertebrae. STEDMAN'S at 1678.

139,147 (6th Cir. 1980). Dr. Ghandi's report states that Plaintiff's hip condition is a degenerative disease (R. 279), suggesting that the pain would get more debilitating over time. Dr. Ghandi did not advise Plaintiff to change employment until 1993, which could suggest that Plaintiff's condition had in fact worsened. (Id.)

Except for the evidence that Plaintiff is able to conduct some activities, there was no evidence to contradict his testimony about his hip pain or Dr. Ghandi's report. Rather, Dr. Abramson's testimony corroborated Plaintiff's testimony that he is unable to sit for long periods of a time. Dr. Abramson testified that while sitting would not affect Plaintiff's heart, "it could affect the hip and I notice that he squirmed around quite a little during the course of this hearing." (R. 79.)[26]

## 2. Fatigue.

The ALJ also discounted Plaintiff's testimony that he tired easily and had to lie down often (R. Id. at 45, 52.) Again, medical evidence supports this complaint. The ALJ discounted Plaintiff's fatigue because Dr. Abramson testified that it was in part caused by lack of exercise. (R. 26.) That reasoning is circular. Dr. Abramson noted that Plaintiff had cardiomyopathy and that this was part of the cause of his fatigue. (R. 80.) He also noted that his heart could get worse with physical exertion. (R. 75.) Plaintiff testified that he tried to exercise and it sometimes caused him pain (R. 52) therefore his doctor told him to quit. Dr. Ghandi's report notes motor weakness in Plaintiff's quadriceps. (R. 279.) Plaintiff also testified about, and the medical evidence supports, problems

---

[26] Moreover, Dr. Abramson specifically stated that he could not opine about Plaintiff's claim of impairment due to his hip condition because that was not within his (Dr. Abramson's) area of expertise. (R. 72.)

with edema if he sits or stands for long periods. (Id. at 58, 80, 343.) As noted above, Dr. Eyebel's report notes fatigue as one of the symptoms of Plaintiff's heart condition. (R. 336.) In his report Dr. Eyebel also stated that Plaintiff is not a malingerer. (R. 336.)

This point is significant, because Plaintiff's counsel asked the vocation expert, "if we add [to the ALJ's hypothetical] that because of fatigue and tiredness he would need to lay down on at least one occasion during the day . . ." The vocational expert testified that there were "no provisions in the industry to lay down except by accident, so he wouldn't be able to do any work then." (R. 86.)

### 3. Memory and concentration.

The ALJ concluded that Plaintiff's cardiac condition did not affect his ability to concentrate in such a way as to preclude him from doing semi-skilled or unskilled labor. (R. 26.) In so concluding, the ALJ discounted completely Dr. Eyebel's report that Plaintiff's symptoms would "often" interfere with his concentration and attention. (R. 337.) To justify giving no weight or deference to the treating physician's opinion, the ALJ stated, first, that Dr. Eyebel did not explain his answer, and second, that Plaintiff's treatment records provide "no specific support for the conclusion." (R. 26.) As to the first point, the Social Security form that was provided to Dr. Eyebel does not require or even provide a space for an explanation of that answer. See R. 337. On the second point, the ALJ discussed some of the notes made by Dr. Eyebel and Dr. Hennesessy, the physician who inserted Plaintiff's defibrillator (R. 26.) It is not clear from the ALJ's opinion why she concluded that the notes she mentioned justify disregarding Dr. Eyebel's opinion. However, it is clear that the ALJ picked and chose among the notes to support her conclusion. For example, the ALJ states that Dr. Eyebel's December 20, 1995 notes report that the Plaintiff had no chest

discomfort, no peripheral edema and that cold air was not bothering him. However, the ALJ does not discuss the June 19, 1996 report by Dr. Hennessey which reported that Plaintiff complained of dizziness when he stands up quickly and that "[e]xtremities revealed 1-2+ bilateral pretibial edema." (R. 343.) The ALJ notes that Dr. Eyebel's report in January 1997 indicates no angina, but the ALJ fails to note that the report also indicates Plaintiff's peripheral edema and that cold air was causing some chest heaviness. (R. 349.)

The ALJ did not discuss the Plaintiff's medically documented cerebral infarcts. Dr. Abramson testified that "there is no question" that Plaintiff's heart stopped working and that the records indicate that Plaintiff had experienced cerebral infarcts in both parietal lobes, although Dr. Abramson has no way of knowing whether that lead to difficulties in the Plaintiff's brain or his ability to concentrate. (R. 72.) The July, 1995 hospitalization record shows that Plaintiff had to be revived by cardiac defribrillation paddles more than once due to his cardiac arrests. The arrests caused cerebral infarct.[27] (R. 227.)

Again, the Seventh Circuit's decision in *Clifford* is instructive.

> [M]ore weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances. A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. A claimant however is not entitled to disability benefits simply because a physician finds that the claimant is "disabled" or "unable to work." Under the Social Security regulations, the Commissioner is charged with determining the ultimate issue of disability.

*Clifford*, 2000 WL 1297717, at *5 (citations omitted).

Here, the ALJ discounted the treating physicians conclusions based on the ALJ's opinion that

---

[27] As previously noted, infarct is brain tissue death. See N. 9, *supra*.

the medical records did not show any cardiac symptoms likely to impair Plaintiff's concentration in any way. (R. 26.) The ALJ also noted that Plaintiff can drive, cook and read. She concluded, "I do not except [sic] that claimant's cardiac symptoms so affect his concentration as to preclude him from performing semiskilled work."

The Seventh Circuit's opinion in *Clifford* is on point here:

> The ALJ did not provide any explanation for his belief that Clifford's activities were inconsistent with Dr. Combs's opinion and his failure to do so constitutes error.

> We have likewise insisted that an ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record. *Rohan*, 98 F.3d at 968 ("[A]s this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). . . In giving little or no weight to this finding, the ALJ did not cite to any medical report or opinion that contradicts Dr. Combs's opinion. In effect the ALJ substituted his judment for that of Dr. Combs and left unexplained why Clifford's activities were inconsistent with Dr. Combs's opinion. That was error.

2000 WL 1297717, at *5-6.

Here, there was no was no medical opinion contradicting that of Dr. Eyebel. Like the ALJ in Clifford, the ALJ here substituted her own medical judgment for that of Dr. Eyebel. This point is significant in this case, because the Plaintiff's attorney specifically asked the vocational expert what his opinion would be if, in addition to the physical limitations contained in her hypothetical, "the individual often experiences cardiac or other symptoms severe enough to interfere with his attention and concentration." The vocational expert, Frank Mendrich, testified, "Well, the skill that he's transferring is a high degree of accuracy, so if the distraction is such that he loses his ability to be accurate then he wouldn't be able to perform the job." (R. 85.)

The ALJ's opinion states that even if Plaintiff could not perform semi-skilled work, the

vocational expert identified a significant number of light unskilled jobs that he could perform, i.e., inspector/tester and unskilled cashier jobs. (R. 26.) However, that conclusion misreads the vocational expert's testimony. The vocational expert testified that the inspector and cashier jobs required accuracy: "[W]hen you say it's right, it's got to be right." (R. 85, *See also*, R. 84.) He did not testify that the unskilled inspection and cashiering jobs did not require accuracy, and, contrary to the ALJ's conclusion (R. 26), the vocational expert was not asked whether there were unskilled jobs he could perform if his symptoms interfered with his concentration and attention. Indeed, his testimony suggests the contrary. (See R. 84-91.) He testified that all of the inspection jobs require the ability to be accurate: "[I]t's a relatively easy job to do but you have to be accurate." (R. 88.) "[T]here is an expectation of a great deal of accuracy." (R. 89.)

The ALJ's Hypothetical question.

A hypothetical question must be supported by the medical evidence in the record. *Meredith v. Bowen*, 833 F.2d 650, 654 (7th Cir. 1987). In this case, the ALJ posed the following hypothetical:

> [A]ssume an individual who is a 50 year old man and a high school education plus a year or two of college and the same past relevant work as claimant. Let's assume that he can, he is able to lift no more than 15 pounds, he is able to stand for 1 to 2 hours, at a time and then he needs a break. He is able to walk for several blocks at a time. He is able to sit indefinitely. Let's also assume that he should work in a low stress environment and by that I mean that he is able to use independent judgment and work at a regular or slower pace but needs a predictable work flow. No fast paced work, no emergency deadlines and no expectation that there will be high levels of interpersonal conflict.

(R. 83-84.) In response, the vocational expert, testified that the Plaintiff could perform semiskilled jobs as a clock and watch inspector of parts or do cashiering jobs. He could also perform unskilled jobs as an inspector and tester, although the rate of work was a little faster. (R. 86.)

The hypothetical question posed by the ALJ contained assumptions unsupported by the

evidence. Contrary to the hypothetical and the ALJ''s opinion (R. 26), Dr. Abramson did _not_ opine

that Plaintiff could lift as much as 15 pounds. Dr. Abramson opined that Plaintiff could lift 10

pounds. (R. 78.) The only testimony discussing "15 pounds" is Plaintiff's testimony that he sits

with his grandchild on his lap, but does not lift him or walk with him, and Dr. Abramson's question

whether the child weighed 15 pounds, to which Plaintiff did not know the answer. (R. 77.)

Likewise, the assumption that Plaintiff could stand 1-2 hours and could walk several blocks has no

support in the record. Dr. Abramson testified that, as far as the heart is concerned, Plaintiff could

stand for "an hour or more" but it could be a problem as it relates to Plaintiff's hip. (R. 79.) He said

the same about walking. (R. 79.) The assumption that Plaintiff could sit "indefinitely" not only

completely disregards Plaintiff's testimony, which was supported by Dr. Ghandi's report, but also

ignores the testimony of Dr. Abramson that Plaintiff was, in fact, "squirming around" during the

hearing, a fact that Dr. Abramson could observe although he was not medically qualified to opine

on Plaintiff's hip condition. A hypothetical question that contains assumptions not supported by the

record cannot support the conclusion that the applicant is not disabled.

The vocational expert testified that the unskilled cashier jobs would require Plaintiff to sit

for 4 hours and stand for 4 hours. (R. 92.) The ALJ's opinion does not discuss this testimony.

There is nothing in the record to support the position that Plaintiff could do so.

As discussed above, Plaintiff's ability to engage in substantial gainful employment must be

evaluated in the light of common sense and with the burden of proof on the Commissioner. Plaintiff

had a history of meaningful, regular employment, even after a total hip replacement, until he suffered

a heart attack that put him into cardiac arrest. After he was revived, he still suffered from

cardiomyopathy. He now asserts that the combination of his impairments prevents him from

22

substantial gainful employment. The ALJ has found that he cannot return to his previous employment, but found that there were a substantial number of jobs that he could perform. In coming to this conclusion, the ALJ committed the errors described above. Viewing the evidence as a whole, it is the opinion of this Judge that the evidence does not support the ALJ's conclusion that the Commissioner has carried the burden of proving that jobs that Plaintiff can perform exist in substantial numbers.

## CONCLUSION

After carefully reviewing the entire record herein, this Court concludes that the ALJ's finding that Plaintiff is not disabled is not supported by substantial evidence in the record as a whole. Pursuant to 42 U.S.C. §405(g), the court is empowered to enter a judgment affirming, modifying or reversing outright the decision of the Commissioner, with or without remanding the cause for further proceedings before the ALJ. This Court is mindful of the deference to which decision of the Commissioner are entitled when such decisions are supported by substantial evidence. That policy also favors remand to the Commissioner for further remand to the ALJ for a new hearing and decision of those cases where further proceedings and proper analysis of the evidence could arguably lead to the same decision. However, the court need not remand "when no useful purpose would be served by further administrative proceedings, or when the record has been fully developed and there is not sufficient evidence to support the ALJ's conclusion." *Holden v. Shalala*, 846 F. Supp. 662 (N.D. Ill 1994). If the issue were solely whether Plaintiff suffers from a listed impairment, the proper course might be to remand to allow the ALJ to consider all of the evidence. Here, however, remand would serve no good purpose. Even if the ALJ were to reach the same conclusion at step

three, the record has been fully developed and the Commissioner has not carried his burden at step five of showing that there are significant number of jobs that this plaintiff could perform in spite of his impairments. In fact, the record, fairly considered, demonstrates the opposite. In such a case, remand would only further delay Plaintiff's receipt of benefits. *Olson v. Apfel*, 17 F. Supp. 2d 783, 792 (N.D. Ill. 1998).[28]

For the preceding reasons, this Court respectfully recommends that Plaintiff's Motion for Summary Judgment should be **GRANTED**, the Commissioner's Motion for Summary Judgment should be **DENIED**, and this case be remanded to the Secretary pursuant to the Court's authority under 42 U.S.C. S 405(g) for the sole purpose of determining the period of disability and the payment of benefits.

Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed. R. Civ. P. 72(a). Failure to file objections with the District Court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the report and recommendation. Lorentzen v. Anderson Pest Control, 64 F.3d 327, 330 (7th Cir. 1995).

ENTER:

*Geraldine Soat Brown*

**Geraldine Soat Brown**
**United States Magistrate Judge**

**Dated: September 18, 2000**

---

[28] In this regard, the Court notes that Plaintiff filed his application for benefits in 1995, more than five years ago, and that there was substantial delay in scheduling the initial hearing. (R. 298-300, 315).

24